**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHARLES N.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 22 C 6749** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **MARTIN J. O'MALLEY,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381a, 1382c, about three and a half years ago in September 2020. (Administrative Record (R.) 265-72). He claimed that he had been disabled since March 17, 2019 (R. 265) – he amended that to August 1, 2020 (R. 271)[2] – due to "m[e]niscus tears in knees, cysts in knees, joint infusion, distal femoral diaphysis, acl and tcl damage, arthritis, acid reflux, depression, stress, suicidal ideations, back problems, severe pain, insomnia, anxiety, nerve damage." (R. 298). Over the next two years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the most recent ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on December 1, 2022, and the parties consented to the

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

[2] The plaintiff filed a prior application and was found not disabled by an ALJ on July 23, 2020. (R. 107-118).

jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on December 7, 2022. [Dkt. #8]. The case was reassigned to me on April 2, 2024. [Dkt. #29]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: "bilateral knee impairments (including osteoarthritis); spine impairment; peripheral neuropathy; depression and specific phobia." (R. 15). The ALJ determined that the plaintiff's obesity and GERD were non-severe. (R. 15-16). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering listings 1.15, 1.16, 1.18, and 11.14. (R. 16). Regarding the plaintiff's mental impairment, the ALJ considered listings 12.04 and 12.06, and found that the plaintiff had mild limitations in understanding, remembering or applying information, and in adapting or managing oneself; and that the plaintiff had moderate limitations in n interacting with others; and in concentrating, persisting or maintaining pace. (R. 16-17).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform light work "except he can sit or stand every five minutes; can frequently climb ladders, ropes, scaffolds, ramps, or stairs; can frequently balance, stoop, crouch, kneel and crawl; has to avoid use of automobiles; is capable of persisting on one or two step simple, routine and repetitive tasks that do not require interaction with the public." (R. 17). The ALJ proceeded to summarize the plaintiff's allegations of disability due to meniscus tears and cysts in knees, joint

infusion, distal femoral diaphysis, ACL and TCL damage, arthritis, acid reflux, depression, suicidal ideation, back pain and problems, insomnia, anxiety and nerve damage. The ALJ noted that, at the hearing, the plaintiff said he had pain in both knees from past surgeries that worsened since surgeries. The plaintiff said he did not get good relief from injections. He claimed he could no longer travel to physical therapy because of difficulty being in a car and that he needed to elevate his legs when he sat. The plaintiff also alleged that he developed a right arm problem, but has not sought treatment. The plaintiff also claimed he had numbness and tingling on the bottom of his feet and mainly in the right leg, although the same has developed in the left leg recently; he had problems with falling as a result. And, finally, he alleged side effects of constipation, dizziness, and headaches from medication use. (R. 18). The ALJ found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the "but that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 18).

The ALJ then reviewed the medical evidence. The ALJ found no support in the record for plaintiff's allegations that he had to elevate his legs or that he had issues with falling or that he suffered disabling pain. The ALJ explained that the record showed that the plaintiff failed to pursue recommended treatment of a nerve block, had good strength, and that exams did not consistently show neurological deficits. (R. 18). Plaintiff had a left knee arthroscopy in September 2017, followed up with physical in 2018, and was noted to be doing well afterward, even doing heavy labor part time. An MRI of the right knee taken in January 2019 showed partial thickness tear of the posterior horn lateral meniscus and cartilage defects. Plaintiff underwent a right knee arthroscopy

3

and meniscectomy in April 2019, and again followed up with physical therapy. A November 2019 EMG showed left peroneal neuropathy and atrophy of left quadricep and plaintiff declined a nerve block. In February 2020, examination showed full range of motion of the lumbar spine and cervical spine, normal coordination and balance, normal gait and station, decreased sensation in the dorsum of the right foot, 5/5 strength except in the left quadricep muscle and hamstring. As of his application date, in September 2020, plaintiff's doctor encouraged exercise, and plaintiff was engaging in light exercise, which the ALJ said was inconsistent with reports of disabling pain. (R. 18).

The ALJ went on to note that, at the consultative examination in January 2021, plaintiff had mild stiffness of shoulders; moderate stiffness, pain and reduced range of motion in his knees; mild left ankle pain with slightly reduced range of motion; and back stiffness but negative straight leg raise. Strength, sensation and gait were all normal. In February 2021, the plaintiff stated he only used the lidocaine patch when working out. He reported left knee pain and was referred to physical therapy and to follow up with pain management for nerve block. As of May 2021, plaintiff was taking gabapentin and Tylenol, and was taking ibuprofen rather than using a lidocaine patch once a week when working out. Plaintiff's knees were tender and his gait was antalgic. He reported that he was having trouble connecting with the pain clinic and had been unable to attend physical therapy due to transportation issues. In September 2021, he again was referred to pain medicine and physical therapy. He reported living on the streets and that he had not been taking his medications regularly. Exam showed he was not in acute distress, but had positive straight leg raise and tenderness in paraspinal muscles. (R. 19).

The ALJ then explained that he limited the plaintiff to light work, with reduced postural activities and a sit and stand option, which incorporated the limitations plaintiff reported at his

hearing. Those included sitting or standing every five minutes, as well as ankle, knee, and back pain and neuropathy. The ALJ added that antalgic gait was only mentioned during one exam showed antalgic gait, and that the consultative exam showed minimal deficits. The ALJ further explained that the plaintiff's complaints of constant pain at an 8 or 9 out 10 level was unsupported in by the record conservative treatment and plaintiff's refusal of a nerve block. Plaintiff has not sought options for recommended physical therapy, relying on medication instead. Plaintiff's claims of needing to elevate his legs were not documented in the medical evidence, nor were his claims of a right arm problem. (R.19). Plaintiff had no upper extremity or manipulation issues at his consultative exam, other than some shoulder stiffness, and normal range of motion. Despite alleged numbness and tingling on the bottom of the feet and legs and resultant falling, plaintiff did not use an assistive device, was noted to have antalgic gait on just one occasion and no exam showed balance or coordination issues. (R. 19).

From there, the ALJ moved on to consider the evidence pertaining to plaintiff's mental impairments. In November 2020, plaintiff was noted to be practicing coping strategies and working on relaxation techniques. Caring for his mother following her surgery was a stressor for him, but his mental status exam was normal, with cooperative behavior, normal affect, cognition and thoughts. Mental status exam was normal in February 2021. He said he was feeling better in March 2021, and mental exam was again normal although he claimed to have had an anxiety attack while getting in a car. In September 2021, plaintiff was diagnosed with specific phobia of riding in a car. He reported an increase in symptoms, but was off medications. He had been living on the street, but his mother found him and he returned to her house. Mental status exam was normal other than sadness. Grooming was good, and thoughts, attention, and concentration were all normal. (R. 19).

5

The ALJ said that he had limited the plaintiff to no use of automobiles, and to one or two step simple, routine and repetitive tasks that do not require interaction with the public. The ALJ explained that this accommodated his specific phobia of automobiles, as well as his depression. The ALJ further explained that the record didn't support any additional limitations. There had been no indication of emergency room visits or psychiatric hospitalizations. Plaintiff improved when taking his medications. Mental status exams failed to show significant deficits and many times were normal. There was no evidence to show that the plaintiff was unable to remain on task in excess of the 10 to 15 percent acceptable to employers. The ALJ noted that plaintiff reported being able to follow television in binge-watching sessions, play games on his phone, clean and do chores, walk for exercise, and work on self-help materials. (R.19).

Next, the ALJ considered the medical opinions in the record. The ALJ found the opinions from the state agency reviewing doctors and psychologists persuasive. They accounted for findings documented through the period of and were consistent. The ALJ allowed that the reviewer could not consider documentation produced at the hearing level or, of course, any testimony. Such evidence included, which the ALJ had accounted for, as well as the allegation of needing to alternate between sitting and standing.

The ALJ went on to consider the questionnaire that plaintiff's advanced practical nurse filled out on September 29, 2020, but noted it did not cover the period in issue, which began with the date of plaintiff's application in September 2020. The ALJ found that the APN's opinion that plaintiff could only tolerate a total of less than four hours a day of standing, sitting, or walking was inconsistent with plaintiff's own testimony. The APN suggested plaintiff could only rarely 20 pounds, and only occasionally lift 10 pounds. The ALJ said that the nurse's opinion that plaintiff

6

would need unscheduled breaks every 15 to 20 minutes was inconsistent with her opinion that he could sit one hour at a time. The ALJ also said that conservative treatment and exam results did not support the nurse's finding that plaintiff would miss more than four days per month. Overall, the ALJ felt that the clinical findings did not support the extent of limitations the nurse indicated, and that her opinion had minimal persuasive value. (R. 20).

The ALJ also found the questionnaire dated September 29, 2020, from APRN Bernard Vonderhaar no more than minimally persuasive. As with the other questionnaire, it did not account for the findings during the period in issue. The ALJ found it internally inconsistent, as the nurse stated that the plaintiff had a marked limitation in understanding very short and simple instructions and moderate limitations in maintaining attention and concentration for extended periods and performing within a schedule, but rated the limitations in areas of function as "mild." Also, the nurse felt the claimant would be off task no more than 10 percent but would be absent more than three days a month. The ALJ thought the limitations were not consistent with findings that APRN Vonderhaar made during the period in issue as numerous mental status exams show good functioning, and conservative treatment. Therefore, he found minimal persuasive value in APRN Vonderhaar's answers. (R. 20).

Next, the ALJ noted that the plaintiff had no past relevant work. (R. 22). He then relied on the testimony of the vocational expert to find that the plaintiff retained the residual functional capacity to perform jobs that existed in significant numbers in the national economy, such as: sorter (DOT #222.687-022; 100,000 jobs nationally); labeler (DOT #920.687-126; 9,000 jobs nationally; and inspector/hand packager (DOT#559.687-074; 8,000 jobs nationally). (R. 22). Accordingly, the ALJ determined that the plaintiff was not disabled and not entitled to Supplemental Security Income

under the Act. (R. 23).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within

which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax," *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on

9

the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

   Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on that panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

   Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court explained that the ALJ had to:

   explain why he rejects uncontradicted evidence. One inference from a silent opinion

is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit has again emphasized that all ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The court has explained "that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024); *see also Morales v. O'Malley*, – F.4th –, –, 2024 WL 2794055, at *1 (7th Cir. May 31, 2024)(". . . ALJs are 'subject to only the most minimal of articulation requirements"—an obligation that extends no further than grounding a decision in substantial evidence."). So, as ever, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). But, as it happens, the ALJ has failed to do enough here.

## III.

The plaintiff raises a number of arguments in support of his motion to remand this case to the Commissioner, but we focus on the argument regarding the ALJ's residual functional capacity finding that plaintiff was limited to "one- to two-step"work and his hypothetical to the vocational expert that plaintiff was limited to "simple" work because the error the ALJ made in that respect requires a remand.

## A.

Plaintiff couches his argument in terms of the ALJ's RFC evaluation failing to comply with

11

SSR 96-8p, but it is really about the path from the evidence to the ALJ conclusion. The path begins with the ALJ's treatment of the assessment from the state agency reviewing psychologists. The ALJ said he:

> afford[ed] substantial persuasive value to the DDS medical and psychological consultants' assessments. The consultants accounted for findings documented through the period of reconsideration. There was consistency between both medical assessments and between both psychological assessments. However, the consultants could not consider documentation produced at the hearing level or, of course, any testimonial assertions. At the hearing level, documentation included references to a phobia of being in a car that the claimant reported to APRN Vanderhaar (e.g. B8F/27). I accounted for that and for testimonial assertions of tolerating only five minutes of sitting and standing, in light of newer clinical findings of antalgic gait.

(R. 21).

The plaintiff points out that both of the reviewing psychologists found that the plaintiff was "capable of performing one and two-step tasks." (R. 150, 163). And, as already noted, the ALJ made that a part of his RFC finding, specifically stating that plaintiff was "capable of persisting on one or two step simple, routine and repetitive tasks that do not require interaction with the public." (R. 17). But, the plaintiff argues that, nevertheless, the ALJ ran afoul of SSR 96-8p [Dkt. #17, at 5, 6-7], which states that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8P, 1996 WL 374184, *7; *see also Conrad v. Barnhart*, 434 F.3d 987, 991 (7th Cir. 2006). But, clearly, the ALJ's RFC, which specifically included the state agency reviewers' limitations to one- and two-step tasks, so his RFC didn't conflict with the reviewers' assessments.

Plaintiff's citation to SSR 96-8p may be inexact but his point is made. It's about the jobs that the vocational expert found that the plaintiff could do – and that the ALJ found that the plaintiff could do – which the plaintiff argues are not one- or two-step jobs. At the hearing, rather than

12

simply using the one- and two-step language from the state agency reviewers – whose opinions he "afford[ed] substantial persuasive value" – and from what would be his own RFC finding (R. 17), the ALJ instead asked the vocational expert about "simple, routine, and repetitive tasks . . . ." (R. 63). Given *that* limitation, the vocational expert testified that the plaintiff could perform jobs like sorter (DOT #222.687-022)[3], labeler (DOT #920.687-126), and inspector and hand packager (DOT #559.687-074). (R. 63). These types of disconnects are all too common and all too easy to avoid in the first place, but that is not what is at issue either. As plaintiff explains it in his reply brief, his argument is "that a limitation to one-to-two-step tasks was inconsistent with the Step 5 jobs – not the limitation to simple, routine, and repetitive tasks." [Dkt. #26, at 1-2].

The three jobs the vocational expert identified – sorter, labeler, and inspector/hand packager – are all cataloged as Reasoning Level 2 jobs in the Dictionary of Occupational Titles, which is defined as:

> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

https://occupationalinfo.org/appendxc_1.html. By comparison, Reasoning Level 1 is defined as:

> Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

https://occupationalinfo.org/appendxc_1.html. So, R 1 jobs are specifically limited to "simple one-or two-step instructions" whereas R 2 jobs involve "detailed but uninvolved written or oral instructions" which, while not the clearest definition, are at least beyond "one- and two-step instructions" or it would not be the next level. Obviously, if the ALJ had just taken the easy route

---

[3] The code number for this job is actually listed as "routing clerk," not "sorter."

and told the vocational expert he was looking for jobs involving "simple one- or two-step instructions" as the two state agency reviewers had found, instead of using his own language – "simple, routine, and repetitive tasks" – we might not be here parsing the arcane language of DOTs and vocational experts and ALJs and gauging the difference between "detailed but uninvolved" instructions and "simple, one- or two-step instructions."

The Commissioner does yeoman's work trying to rehabilitate the ALJ's decision, noting that "[c]ourts in this jurisdiction have not reached a consensus regarding the relationship between simple tasks under the DOT and the Social Security regulations." [Dkt. #23, at 8, quoting *Mendel R. v. Berryhill*, 2019 WL 1858510, at *6 (N.D. Ill. Apr. 25, 2019)]. The Commissioner goes on to point out that:

> while some courts have remanded cases to resolve a perceived conflict between VE testimony that a person limited to simple, routine tasks could perform jobs with a DOT reasoning level of two, and the DOT's description of reasoning level two jobs as requiring the carrying out of 'detailed but uninvolved written or oral instructions.'. . . other courts have found no inherent inconsistency between simple work restrictions and Reasoning Level 2 or Reasoning Level 3 positions.

[Dkt. #23, at 8]. The Commissioner then concludes that there is no apparent conflict between a DOT Reasoning Level of 2 and a restriction to simple, routine, and repetitive work, and backs that up with a number of cases: *Tina I. v. Kijakazi*, No. 20 C 50327, 2022 WL 80245, at *1 (N.D. Ill. Jan. 7, 2022) (RFC for "simple, routine, and repetitive work"); *Stephen M. v. Berryhill,* No. 17 C 7608, 2019 WL 2225986, at *4 (N.D. Ill. May 23, 2019)(RFC for "simple, routine, repetitive work"); *Vanhphenh S. v. Saul*, No. 18 C 6121, 2021 WL 1315633, at *4-5 (N.D. Ill. Apr. 8, 2021)(RFC for "simple work of a routine type"); *Mendel R. v. Berryhill*, 2019 WL 1858510, at *2 (N.D. Ill. Apr. 25, 2019)(RFC for "simple and unskilled work involving simple decision-making")(able to

14

"understand, remember and carry out simple instructions in a routine work setting with few, if any, changes"). [Dkt. #23, at 8-9].

That's all fine, but the ALJ's RFC didn't say the plaintiff was capable of simple work; it said the plaintiff "is capable of persisting on one or two step simple, routine and repetitive tasks." (R. 17). The one- or two-step limitation tracks not only the opinions of the two state agency reviewers, but the language of Reasoning Level 1. What can be gleaned from the Commissioner's well-reasoned – if misdirected – argument is that "simple" is a fairly expansive adjective when applied to work in this context. "One- or two-step", on the other hand, is very specific. It falls perfectly into Reasoning Level 1, but clearly falls short of Reasoning Level 2.[4]

---

[4] While the Seventh Circuit hasn't specifically addressed an argument exactly like the plaintiff's, it has weighed in on the Reasoning Level 1 versus Reasoning Level 2, simple versus steps issue in the context of SSR 00-4p. SSR 00-4p applies when there is an apparent conflict between the vocational expert's testimony and the DOT:

> When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.

In *Surprise v. Saul*, 968 F.3d 661 (7th Cir. 2020), at the administrative hearing, a medical expert testified that the plaintiff could perform work involving "simple, noncomplex, routine, repetitive, type of instructions", which the expert defined as "direct, one or two steps or three steps that can be easily followed." 968 F.3d at 660. When the ALJ then questioned the vocational expert about available jobs, the ALJ edited out the number of steps and asked is the plaintiff "would be able to perform work that's considered routine, repetitive, noncomplex, simple, noncomplex-type of instructions." *Id.* The vocational expert identified three jobs. When questioned by plaintiff's counsel regarding the steps limitation from the medical expert, the vocational expert explained that because the DOT does "not describe exactly what a step is," no jobs that he had identified required only level 1 in each of the three GED categories—math, language, and reasoning." *Id.*

Before the Seventh Circuit, plaintiff's counsel argued that, assuming one- to three-step instruction jobs fell between Reasoning Level 1 – "simple one- or two-step instructions" – and Reasoning Level 2 – "detailed but uninvolved written or oral instructions" – jobs at Reasoning Level 2 would exceed the plaintiff's limitations because they would be above Reasoning Level 1 in the hierarchy. *Surprise*, 968 F.3d at 662. But, the Seventh Circuit rejected the argument, finding that the plaintiff had:

(continued...)

Again, we don't know why the ALJ chose to say "simple" to the vocational expert and "one- or two-step" in his RFC finding. We don't know why these types of issues recur when they would be so easy to avoid. What we do know is that the ALJ relied on the vocational expert's testimony to find the plaintiff not disabled, but never gave the vocational expert the chance to say whether there were any jobs that fit the ALJ's RFC for one- or two-step tasks. That's not substantial evidence and this case has to be remanded.

**B.**

As the case must be remanded the court need not address the plaintiff's other criticisms of the ALJ's decision. But, it's worthwhile pointing out that the ALJ's assumption that someone who changes positions from sitting to standing every five minutes all day long can remain on task for the required amount of time. When the ALJ added this limitation to the mix while questioning the vocational expert, the exchange went like this:

> VE: So the person has to change positions, sit/stand with –
>
> ALJ: Yes. Every five – for five minutes. Change every five minutes.
>
> VE: Okay. If they had to change positions every five minutes, and they were able to remain on task, then they still could perform those jobs. But if they were not able

---

[4](...continued)
not identified any conflict between a one- to three-step instruction limitation and a job requiring reasoning level 2. . . . Surprise has identified no authority saying that a one- to three-step instructions limitation is incompatible with reasoning level 2. Rather, courts have concluded only that a limitation to one- to two-step instructions disqualifies a claimant from occupations requiring this reasoning level. *See Stanton v. Comm'r, Soc. Sec. Admin.*, 899 F.3d 555, 558–59 (8th Cir. 2018); *Henderson v. Colvin*, 643 F. App'x 273, 277 (4th Cir. 2016); *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1003 (9th Cir. 2015). In fact, we have gone as far as to say that there is no apparent conflict between a simple tasks limitations and level 3 reasoning—a more demanding standard than level 2. *Sawyer v. Colvin*, 512 F. App'x 603, 610–11 (7th Cir. 2013).

*Surprise*, 968 F.3d at 663.

to remain on task, then they would not be able to perform those positions.

(R. 64).

Note that the vocational expert said "if"; that's a big "if." It's certainly not evidence that the plaintiff would be able to stay on task while getting up and sitting down every five minutes. The only evidence the ALJ cited for that proposition was normal attention and concentration noted at exams, an ability to binge watch television shows and play video games, and a report from APN Vonderhaar that plaintiff would be off task up to 10% of the day due to poor concentration. (R. 20, 21). Neither brief argues that spans of attention at exams nor binging tv shows have much to do with sorting, inspecting, and packaging items coming by at a work bench all day while standing and sitting twelve times every hour. *See, e.g., Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020)("An ALJ may not equate activities of daily living with those of a full-time job. . . . But an ALJ is not forbidden from considering statements about a claimant's daily life."); *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014)("As we have said, it is proper for the Social Security Administration to consider a claimant's daily activities in judging disability, but we have urged caution in equating these activities with the challenges of daily employment in a competitive environment . . . ."); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home" and work environments.). It is far easier to change positions passively watching televison than it would be actively handling, moving, and packing items at a work bench. And Nurse Vonderhaar was rating plaintiff's on-task abilities based only on his poor concentration. (R. 371). When one

17

adds the ups and downs, going from sitting to standing, all day every five minutes[5] to that, the off-task figure is arguably getting into the 15% zone and that is generally the cut-off point for employment. (R. 65). On remand, the realities of that every-five-minutes-sit-stand-option warrant another look.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion to reverse and remand the ALJ's decision [Dkt. #17] is granted, and the defendant's motion for summary judgment [Dkt. #22] is denied.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/30/24

---

[5] Not to mention the fact that testing in January of 2020 revealed that plaintiff had quite a bit more difficulty that the average person transitioning from sitting to standing due to his severe knee and back impairments. (R. 841). So, add that to the mix and that off-task figure gets even bigger.

18